Good morning, Illinois Appellate Court, 1st District Court is now in session. The Honorable Justice Robert E. Gordon presiding. Case number 1-8-0-9-2-9, People v. Shalena Zavala. Okay, would the lawyers who are going to argue the case please introduce yourself to the court. Good morning, Your Honors. My name is Carolyn Clarquist from the Office of the State Appellate Defender here on behalf of Appellant Shalena Zavala. Good morning, Your Honors. David Iskowich. I'm with the Cook County State's Attorney's Office arguing on behalf of the people. As to the defendant, do you want to reserve some time for rebuttal? I think just a minute would be suffice. Okay, well, let's proceed. Okay, good morning, counsel. Good morning to you as well. In this case, there is only one issue raised on appeal. Whether or not the state proved beyond a reasonable doubt that Shalena Zavala committed the offense of misdemeanor theft by deception and theft, and that she knowingly obtained by deception control over $40 from Pedro, Texas, and then did not tender that money to the Chicago Police Department, City of Chicago. Zavala was a 10-year veteran at the Records Department at CPD headquarters. There's some issues here that are absolutely not in dispute. And the main one is that Texas did give her $40 in exchange for some documents. He was there to obtain a copy of his rap sheet and also a clearance letter, which is a document provided to immigration, basically certifying whether or not the individual named in the document has any convictions. Let me ask you this question. Why did she charge $40? You know, we don't have that information. What we know is that he gave her $40. She asked for $40. The issue here is that the system that was in place at this Records Department seems to be a little bit haphazard, where there are several windows with people assigned to different tasks. But the record also shows, based on the testimony of a retired supervisor from that department, that these employees were cross-trained and were sort of covering each other's jobs, if you will, in situations when the office was busy, which it sounds like from the testimony on this day in December, it was a busy day. Well, did the evidence show that she overcharged? I think the total, the state was correct, that the total would be $21. I mean, she asked for $40. She obviously did not testify in the case. She had no obligation to do so. Why there is a request for $40? But the process would be that, well, first of all, the individual who is buying the documents, if you were purchasing the documents, would get the documents and then be told to go to the cashier's office. I'm sorry, window. And from the testimony that we have from the retired supervisor, it sounds like in this situation that often what would happen is the customers would tender money to the clerks, and then the clerks would place the money in a box next to the cashier's station. Now, that's not the proper procedure. And I think that Sergeant Malloy testified that, no, you can only have cash given to the cashier, him or herself, not to these individual clerks. That's how it should have been run. However, it seems like on a daily basis that's not exactly what was going on at this office, and it wasn't uncommon for the clerks to obtain cash directly from the customers and then proceed to leave it in this box. It sounds like it's on a chair or else they hand it to the – Didn't the evidence show that she never even gave a receipt? That's right. But the cashier is the one who dispenses the receipt. So my reading of the record, it sounds like what happens is there's the paperwork and receipt put in the cashier's box or given to her, and then once the cashier processes the transaction, then the customer is called up and given a receipt. So, no, there's no dispute he didn't obtain a receipt in this case. But in addition to that, I mean, I think another problem that's going on here and why the evidence is insufficient is that there's conflict between the state's witness, Sergeant Malloy, and the supervisor in terms of what should be going on at this office and the process. And it sounds like, as I said, that some of these clerks were not the best trained. I realize that my client was there for 10 years. But from the defendant's testimony – I'm sorry, from Pedro's testimony, when he arrived with his girlfriend, they encountered another clerk who also gave them the wrong paperwork. So, unfortunately, that doesn't seem to be an uncommon problem here at this records office. And in this case, there was also a dispute about whether these rap sheets should have the code redacted at the top. And what the code is, if you look at the rap sheet, at the very top of it, there's a series of numbers. And in this case, you can find it. It is in the common law record. We agree with the state that exhibits weren't actually – I don't think they were impounded, but they are in the common law record. So, if you look at the rap sheet, you can see at the top that there's a series of numbers. And in this case, there was a conflict between what the sergeant said should be redacted and what the supervisor said should be redacted. So, once again, there's conflicting evidence about the procedure that is going on in this records department and what exactly should be done but what is actually being done on a daily basis. And, again, I mean, Savala told the investigator she put the money on the chair. She certainly doesn't deny taking it. I understand that it's $40 and the total should be $21. I mean, he says she asked for that, but nonetheless, she accepted it and she said she did. And she said she put it by the cashier's chair, which is what they seem to be doing. Well, that wasn't what they should be doing. Well, let me ask you this. She's been there for 10 years. She knows it shouldn't be $40. How do you explain that? Well, I mean, I don't know what to say other than the fact that these other clerks were also giving Mr. Tex and his girlfriend the wrong paperwork when they arrived as well. So, it seems to me that, yes, she should know, but she's only the one dispensing the clearance letter and the rap sheet. I don't know if she was accounting for something else, but needless to say, that's correct. I'm not arguing or trying to say that she had some reason to believe it's $40. I did the calculation wrong in my initial brief, and the state is correct. It was $21. I'm not saying she miscalculated it, but the evidence is what it is. And she does admit that she took the $40, but then she says she did put it by the cashier's. It certainly wasn't found on her. As the state points out, she wasn't under arrest at that point, so she wasn't searched, of course. But there's no testimony that anyone ever saw her take the money from him and then put it in her handbag or something like that. What he said is she took it and then put it by the printer. It's not entirely clear where the printer is. I can envision it as sort of one of these clerk offices where they go behind them and leave some paperwork or pull documents off a printer. I haven't been to CPD headquarters to see exactly how this layout is from the office. But, I mean, it seems somewhat bizarre that someone would be doing this at CPD headquarters. Certainly doesn't mean it couldn't possibly happen. But in this case, I think the state hadn't shown beyond a reasonable doubt that it did happen and that she did commit these two misdemeanor offenses. So if the justices don't have any other questions, I just will, like I said, a minute for rebuttal. Okay. Justice Martin, do you have any questions? I just wanted to ask you to just comment. You touched upon it, but I'd like you to comment again on this issue regarding the identification numbers. So as I understand it, the identification numbers sometimes were omitted. But then there were other documents where those numbers were supposed to be affixed so that you could identify who it was who serviced the individual coming. As I understand it, the complaining witnesses documents, those numbers were all obliterated. So I'd like you to just talk about that for a moment to sort of explain why. Of course. So the first two pages of the document, you can look at it in the common law records. Page 25, I believe. No, that's the clearance sheet. I apologize. It's page 23. It's an arrest. But I think we're familiar in our own line of work with the arrest report. I didn't realize this is what they would be referring to at the top. But it says Chicago Police Department has the date and the time. And then there's some redacted information. And then for the I.R. number is listed. From what the records supervisor said, and here's again, this is, again, conflicting evidence. The records supervisor says that the only information that should be redacted is the clerk's number and name. I mean, I don't see her name on this document, a name that in this section where there's some redaction. Whereas the sergeant said that the code at the top was redacted on the first two pages, which she says was improper. We're not disputing it's redacted. You can look at the document yourself. The third page, it's not redacted. You know, it's difficult to tell what's going on here because there are different windows these people are going to. My client was at the window for these clearance letters, not the rap sheet. You know, there was someone else working there. And I'm saying that they gave the rap printed the rap sheet out. It's my client's, you know, identification number on it, according to the evidence deduced at the trial. But again, I just I don't think that the fact that it's redacted where the where the supervisor says it would be redacted. We did be dispositive of her guilt beyond a reasonable doubt. But, yes, the first two pages, the top, if you look at it, is redacted. And on the third page, the last page of the rap sheet, it's not the code. If you go down to the third page, you can see that there's a it's a code. It says by PCOZ 276. I don't know. That's our code, according to the testimony below. OK. All right. Thank you. Yeah, sure. Thank you. Let's hear from the state. Thank you. Good morning again, Your Honors. Miss Clarke, please. The court, David Eskowitz with the state's attorney's office for the people. Just briefly, Your Honor, this is a this is a pretty straightforward case. The standard, of course, is whether any rational trier effect could have found Miss Zavala guilty of two counts of theft beyond a reasonable doubt. Significantly, in these kinds of theft prosecutions, it's fairly common, if not if not essential, that the evidence is going to be circumstantial. It's not it's not a rare it's not a common occasion where a thief under these circumstances will be caught red handed. So circumstantial evidence is significantly important in such cases. And circumstantial evidence, of course, is viewed under the same lens as direct evidence in a sufficiency challenge. The trier effect here, the trial judge sitting as trier effect was authorized to link up all of the events that occurred during this transaction and determine whether or not those links amounted to two counts, two theft, two counts of theft. With respect to the $40, I believe Justice Gordon, you're concerned about that. That's correct. $40 was for two documents that should have been a sum total of $21. I believe that at the trial, the theory or the inference that could be drawn from this was that $40 was an easy amount to take. There was no change necessary. And it was taken behind the counter, as the witnesses in the text, the two text accounts testified. The defendant from the very beginning of this transaction was very helpful. She volunteered to assist Mr text and his girlfriend, Mr. Mr. Text had limited English skills and his girlfriend, Mr. Was there to help him. The defendant gave him the wrong documents. We all will agree that that's the case. The rap sheet was not certified. He was not fingerprinted And there was no fingerprinting initials or certification on the document as required. He was actually issued two clearance letters for immigration purposes. One of them was issued under one of his aliases, which was completely inappropriate. He just needed one clearance letter under his real name. This issuance of the improper documentation. The theory goes One could draw the inference that she was cutting out all of the other workers at this station at their various windows in order to take the cash. If she had gone through the proper procedures and had Mr. Text to go to the fingerprinting window and to the cashier window. That would, that would have pretty much prevented her from taking the money under the circumstances. She did by issuing false or not false, but the incorrect documents hastily put together. A reasonable trier fact could infer from that that she was trying to cut out two of the other workers there that Mr. Text, it would have needed to go through to get the proper papers. There was no receipt issued, of course, there were some conflicts in the testimony with respect to the Miss Zavala's authorization to do certain things, although I think that I believe it's Malloy testified that she was not supposed to issue rap sheets. And Ingersoll testified that she could Ingersoll's testimony on that point was that I believe that clerks can do that. Which is true. As far as it goes, fingerprint clerks can do that. Malloy testified that defendant herself was not able to do that, which is true as well because she was not a fingerprinting clerk. And to the extent there are, there are conflicts in that or other evidence, the rules are well settled. I know as your honors know that conflicts and evidence are up to the trier fact to resolve. The resolution of those here cannot be characterized in our view as unreasonable or beyond the pale. Miss Zavala took $40, she gave bad papers, the money disappeared. Any rational trier of fact, in our view, considering this evidence in a light most favorable to the prosecution, it could have concluded that she deprived Mr. Texta of the $40 with the intent to for issuance of those papers. And unless the court has any questions, I respectfully request that this court affirm. And thank you for your time. Justice Martin, do you have any questions? No, sir. Thank you. I don't have any either, but I wanted to point out to both of you that Justice Lampkin is also on this panel, but she's ill today, but she will listen to the arguments and will be part of our decision making process. But let's hear the rebuttal. Yeah, just one point, Your Honor. The evidence here is just unsatisfactory, such that Zavala's conviction cannot be affirmed. There's a lot of conflicting information about what was going on in this office. While Texta did testify that she asked for $40 and he gave her $40, and there's multiple documents that she's given him. Do we assume perhaps she should know the price of all those? I don't know. It seems like there's a cashier that is responsible for the processing and payment of these documents. That wasn't really clear from the record, if that was her role to decide what the amounts were, if that's what happens with the cashier. But either way, other than what I've said here today, I'll just rest on my brace for the remaining points. Thank you. Any questions, Justice Martin? No, sir. Okay, well, thank you very much for your arguments and your briefs, and we'll give you an opinion or an order very shortly. And the court will be adjourned, but we'll have another case and a change of panels, but I'd ask Justice Martin to stay for a moment. And again, thank you very much for your fast arguments.